UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                    Criminal No. 11-25 (RHK/FLN)

　　　　　Plaintiff,

　　v.                                                              **REPORT AND
                                                                    RECOMMENDATION**

**Robert Ellis Hastings,**

　　　　　Defendant.
_____

Michael A. Dees, Assistant United States Attorney, for Plaintiff.
Daniel L. Gerdts for Defendant.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on March 23,

2011 on Defendant's Motion to Suppress Evidence from Unlawful Searches and Seizures (ECF No.

14), Defendant's Motion to Suppress Statements Made by Defendant (ECF No. 16), Defendant's

Motion to Suppress Electronic Surveillance Evidence (ECF No. 17), and Defendant's Motion to

Suppress Identifications (ECF No. 18). At the hearing, the Government called nine witnesses:

Deputies Curtis Struwe and Michael Lavigne from the Wabasha County Sheriff's Office; Chief

Deputy Mark Darnell, Deputy Rich Trogstad, Sergeant Scott Behrns, and Investigator Michael

Ranfranz from the Olmsted County Sheriff's Office; Investigator Jeffrey Sobeczak from the

Rochester Police Department; Agent David Schafer from the Minnesota Bureau of Criminal

Apprehension (BCA); and Special Agent Jamie Rohrbaugh from the Federal Bureau of Investigation

(FBI).  The Government submitted eleven exhibits into evidence and Defendant submitted one

exhibit into evidence.[1]

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends Defendant's motions be **DENIED**.

## I.   FINDINGS OF FACT

### A.   Bank Robbery Investigation

The searches and statements at issue arose from an investigation into a bank robbery that occurred on September 1, 2010. (Tr. 25.) Deputy Curtis Struwe testified that a single white male entered the People's State Bank in Elgin, Minnesota and handed the teller a note that said, "I have a gun. Give me all the money in your drawer. No paper clips or rubber bands." *Id.* Deputy Struwe testified that the note was written on a "license tab for a car, and on that piece of paper was a bar code with some numbers." *Id.* Officers ran the number through the Department of Motor Vehicles and found that it corresponded to a pickup registered to David Paquin. (Tr. 26.) Surveillance video from the bank revealed tattoos on the bank robber's arms and chest that matched those of David Paquin. *Id.* The bank teller also stated that the bank robber had a "blotchy red mark on the side of his face" that matched David Paquin's description. *Id.*

---

[1]Government Exhibit 1 is an Application for Search Warrant and Supporting Affidavit, Search Warrant, and Receipt, Inventory and Return for DNA sample from Robert Hastings. Government Exhibit 2 is an Application for Search Warrant and Supporting Affidavit, Search Warrant, and Receipt, Inventory and Return for 1991 White Honda 4 door car with MN plates. Government Exhibit 3 is an Application for Search Warrant and Supporting Affidavit, Search Warrant, and Receipt, Inventory and Return for specific address on 75th St. NW in Rochester, MN. Government Exhibit 4 is an "Officer Activity Log" for Olmsted County Adult Detention Center for Officer Wilson on 9/13/2010. Government Exhibit 5 is an "Officer Activity Log" for Olmsted County Adult Detention Center for Officer Flicker on 9/13/2010. Government Exhibit 6 is a photocopy of a Complaint against Robert Ellis Hastings Jr. For DAS with VOID written across it. Government Exhibit 7 is a printout of the driving record for Robert Ellis Hastings Jr. Government Exhibit 8 is a Complaint against Robert Ellis Hastings for "Drugs - 2nd Degree - Sale 3 Grams or More - Cocaine/Heroin/Meth w/in 90 day Period" dated 9/15/2010. Government Exhibit 8B is a photocopy of a signed "Advice of Rights Form" dated 9/21/2010. Government Exhibit 9 is an audio disk labeled "10-965760" and "Hastings 2nd Interview." Defense Exhibit A is a four-page "Inmate Activity Log" for Robert Ellis Hastings from 2/22/2009 to 2/22/2011.

Deputy Struwe met with David Paquin's half-brother Todd Chazen[2] at 7:40 p.m. on September 13, 2010.  Mr. Chazen stated that Mr. Paquin was staying at David Casler's house at a specific address on 75th Street in Rochester, Minnesota.  (Tr. 27.)  He stated that a man named Rob was also staying at that address.  *Id.*  Mr. Chazen described Mr. Paquin as paranoid and told Deputy Struwe not to approach the house because there were guns in the house and the residents used drugs.  (Tr. 28-29.)

Deputy Struwe then met with three other investigators and they decided to set up surveillance outside the address on 75th Street.  (Tr. 30.)  At approximately 8:45 p.m., law enforcement observed two cars, a white Honda and a maroon Oldsmobile, leave the house at the same time and travel in opposite directions.  (Tr. 31.)  Law enforcement was not able to see whether Mr. Paquin entered either of the cars.  (Tr. 33.)  Deputy Struwe followed the Oldsmobile which made several U-turns and ultimately returned to a field behind the house on 75th Street.  (Tr. 32.)  Deputy Struwe believed the Oldsmobile to be a decoy car.  (Tr. 33.)

**B.       Traffic Stop of the White Honda**

Agent Rohrbaugh of the FBI followed the white Honda and communicated its description and its direction of travel to Deputy Lavigne.  (Tr. 42.)  Deputy Lavigne assumed surveillance behind the Honda on Highway 52.  (Tr. 43.)  Deputy Lavigne was driving an unmarked minivan, but was in contact with a marked patrol unit.  (Tr. 43-44.)  Deputy Lavigne's intention was to either pull the Honda over for a traffic infraction or approach the car if it stopped and speak to the occupants in an attempt to learn whether Mr. Paquin was in the house on 75th Street.  (Tr. 44-45.)  While driving on Highway 52 Deputy Lavigne could see that the Honda had two occupants, but

---

[2]Deputy Struwe also refers to Mr. Chazen as Mr. Paquin's step-brother.

could not identify them.  (Tr. 44.)

Deputy Lavigne followed the white Honda southbound on Highway 52 in the left lane, traveling at 50 miles per hour.  (Tr. 43.)  When the white Honda was "almost directly across from the off ramp to get on Highway 14 off of Highway 52," the driver turned on his right signal and "abruptly move[d] across the lanes of traffic."  (Tr. 45.)  There were three lanes of traffic, and Deputy Lavigne testified that the Honda "just barely [made] the off ramp to get off of Highway 52 onto 14."  *Id.*  Deputy Lavigne described the Honda's driving as "evasive."  *Id.*  Deputy Lavigne called Deputy Wallace in the marked squad and asked him to pull the white Honda over for unsafe change of course.  *Id.*  Deputy Lavigne continued to follow the white Honda until the marked squad arrived and executed a traffic stop at approximately 9:05 p.m.  (Tr. 46-47, 51.)

As Deputy Wallace was approaching the stopped white Honda, the passenger door opened and a white male fled the car on foot.  (Tr. 48.)  At this time, Deputy Lavigne was just pulling up behind the stopped vehicles and getting out of his car, and he observed from a distance that the fleeing passenger looked similar to the description of Mr. Paquin.  (Tr. 48.)  Deputy Wallace and his canine pursued the passenger on foot.  *Id.*  Deputy Lavigne approached the driver of the white Honda, who was still seated in the car, and asked him, "Who are you?"  (Tr. 49.)  He responded, "Rob."  *Id.*  Deputy Legivne then asked, "Who is the guy that just took off on foot?"   The driver responded, "Dave."  *Id.*  When asked what he knew about Dave, the driver responded, "I bought his truck."  *Id.*  At this point Deputy Lavigne suspected that the man who fled on foot was David Paquin because he knew based on Mr. Chazen's statement that Mr. Paquin was living with a man named Rob and had a truck.  *Id.*  At the hearing, Deputy Levigne identified Defendant as the driver of the white Honda.  (Tr. 50.)

4

Deputy Lavigne took the keys to the white Honda out of the ignition and threw them on top of the car.  *Id.*  He then returned to the minivan to put on his vest, grab handcuffs, and call for backup and to notify the task force members on surveillance of what was happening.  (Tr. 51.) Deputy Lavigne then removed Defendant from his car and patted him down.  (Tr. 52.)  While Deputy Lavigne was patting down Defendant he heard gun shots.  (Tr. 53.)  Deputy Lavigne then handcuffed Defendant and put him in the back of Deputy Wallace's vehicle.  *Id.*  Deputy Lavigne later learned that Deputy Wallace had chased Mr. Paquin into a wooded area.   Deputy Wallace ultimately shot and killed Mr. Paquin after Mr. Paquin approached him with a knife.  *Id.*

## C.    Detention at Olmsted County Adult Detention Center and Driving After Suspension Charge

Olmstead County Chief Deputy Mark Darnell arrived at the scene of the shooting around 9:30 p.m.  (Tr. 64.)  Chief Deputy Darnell was informed that the driver of the white Honda was till on the scene, and Chief Deputy Darnell called Sergeant Tia Flicker at the adult detention center and asked if there was a room to place a subject in until he could be questioned.  (Tr. 65.)  Chief Darnell testified that he made the decision to transport Defendant to Olmsted County Adult Detention Center in order to "free up" deputies.  *Id.*

Government's Exhibit 5 is Sergeant Flicker's log notes from the night of September 13, 2010, and they state, "Deputy involved shooting on the street.  One brought in for interview (Hastings).  He is not under arrest at this time.  Chief Deputy Darnell asked that we temporarily hold him until BCA and investigations can get to him for an interview."  (Govt. Ex. 5.)

Defendant arrived at the Olmsted County Adult Detention Center at approximately 9:40 p.m. (Tr. 79, 84.)  Deputy Rich Trogstad was working as a booking deputy at the time Defendant was brought to the detention center.  (Tr. 78-79.)  Deputy Trogstad testified that he was told by his

sergeant that Defendant was coming in on a Driving After Suspension ("DAS") charge. (Tr. 79.) Deputy Trogstad identified Government Exhibit 4 as his activity log from September 13, 2010. (Tr. 81.) Government Exhibit 4 states, "Hastings in on DAS." (Govt. Ex. 4.) Deputy Trogstad also testifed that he was told "some individuals" would be coming down to speak to Defendant. (Tr. 83.)

Agent David Schafer of the BCA arrived at the scene of the traffic stop at 11:00 p.m. and took control of the scene and the investigation into the shooting. (Tr. 69-70.) Because Agent Schafer did not know what involvement Defendant had in the traffic stop and the officer-involved shooting, he asked the Olmstead County Sheriff's Office to "hang on to" Defendant to be interviewed. (Tr. 71, 73.) Deputy Schafer was advised that Defendant had already been removed from the scene. (Tr. 77.) Agents with the BCA interviewed Defendant around 2:00 a.m. on September 14. (Tr. 74.)[3]

Olmsted County Sherriff's Office Sergeant Scott Behrns testified that he responded to the scene of the shooting on September 13, 2010, but did not have any contact with Defendant. (Tr. 88.) Between 2:00 and 3:00 a.m. on the morning of September 14, 2010, Sergeant Behrns checked Defendant's driving record and wrote Defendant a citation for driving after suspension. (Tr. 89-90; Govt. Ex. 6 and 7.) Sergeant Behrns gave the citation to the booking deputy at the Adult Detention Center sometime before 4:00 a.m. (Tr. 92.) Sergeant Behrns determined that it was necessary for Defendant to be held and appear before a judge the next morning. (Tr. 91.) Sergeant Behrns based this determination on the fact that Defendant had "failed to appear from June 13, 2010," had an address listed from Black River Falls, Wisconsin, and had two entries in his criminal history for bail

---

[3]The Government will not introduce at trial any statements made by Defendant during this interview.

jumping.  (Tr. 91-92.)

Sergeant Behrns testified that he had been told Defendant's license was suspended earlier in the night, and that the suspension was one of the reasons for Defendant's detention, but he could not recall who told him this information.  (Tr. 100-101.)  Sergeant Behrns testified that based upon his review of records from the Olmsted County Sheriff's Office, he knew that Officer John Mitchell of the Rochester Police Department had run Defendant's drivers license records at the scene of the shooting on September 13.  (Tr. 94.)

**D.      Felony Drug Charge**

Officer Jeff Sobczak of the Rochester Police Department testified that he had been conducting a narcotics investigation into Defendant and another individual in early 2010.  (Tr. 105-106.)  When officer Sobczak arrived for work on the morning of September 14, 2010 he learned that Defendant was in jail.  (Tr. 107.)  At approximately 10:00 a.m. Officer Sobczak called the jail and had Defendant placed under arrest on charges related to the narcotics investigation.  *Id.*  Officer Sobczak then faxed his arrest report to the jail.  *Id.*  After notifying the jail, Officer Sobczak had 36 hours to file the complaint against Defendant.  (Tr. 107-108; Minn.R.Crim.P. 4.02, subd. 5(1).)  On September 15, 2010, Officer Sobczak filed a complaint against Defendant for Felony Drugs in the Second Degree.  (Govt. Ex. 8.)  Defendant was arraigned on the complaint the same day.  (Tr. 108.)

**E.      Search Warrants for Defendant's Vehicle and Residence**

BCA Agent Schafer detained Defendant's Honda at the scene of the shooting to be forensically mapped and photographed on the night of September 13, 2010.  (Tr. 72.)  Thereafter, Special Agent Jamie Rohrbaugh of the FBI had the vehicle towed to the Law Enforcement Center in Rochester to be held until a search warrant could be obtained to search the vehicle for evidence

of the bank robbery.  (Tr. 112.)

Deputy Struwe applied for search warrants for Defendant's Honda and for the residence on 75th St. (Govt. Ex. 2 and 3.)  Deputy Struwe served as the affiant for each application, and filed the same affidavit in support of each warrant.  The affidavits describe the bank robbery and the identification of David Paquin as a suspect based on the identification of the license tab form on which the robbery note was written and the fact that Mr. Paquin has tattoos on his arms and chest as described by the bank teller.  (Govt. Ex. 2 and 3.)  The affidavit describes a conversation on September 13, 2010 with a confidential informant who told law enforcement that Mr. Paquin was staying at the residence on 75th Street with "Casler" and "Rob."  *Id.*  The confidential informant also told law enforcement that there were guns in the house and that "everyone there uses drugs."  *Id.* The affidavit then describes the surveillance of the house and of the two vehicles that left the house, culminating in the traffic stop of the white Honda and the shooting of the passenger, who was identified as Mr. Paquin.  *Id.*

Based upon the foregoing, State District Court Judge Terrence M. Walter signed the search warrants for the vehicle and residence on September 14, 2010.  (Govt. Ex. 2 and 3.)  The warrant for Defendant's vehicle lists the following items to be seized: "Portion of the Robbery note, written on a Department of Motor Vehicle registry, that was torn off;" "sums of money from the Bank Robbery in Elgin, MN;" gray tank top; tan shorts; and prescription eye glasses.  (Govt. Ex. 2.) When law enforcement executed the search warrant on the Honda, they found a .22 revolver and a .30-60 rifle, each in a separate bag in the trunk.  (Tr. 113.)

## F.     Warrant for Defendant's DNA

Detective Mike Ranfranz requested a search warrant for a DNA sample from Defendant.

8

(Govt. Ex. 1.)  The search warrant affidavit describes the traffic stop of Defendant's vehicle on September 13, 2010 and the resulting shooting of bank robbery suspect David Paquin.  *Id.*  The affidavit further states that on September 14, 2010, Detective Ranfranz executed a search warrant on the residence on 75th Street, and spoke with David Casler who lived at the residence.  *Id.*  David Casler stated that Defendant was living at the residence and a man named "Dave" had been staying with Defendant in his room for the past week.  *Id.*  Casler stated that on September 13, 2010, they received a call that the "feds" were going to raid the residence and Defendant and "Dave" decided to leave.  *Id.*  Casler observed Defendant carrying "a black brief case, a black bag, and some other things" as he left the residence.  *Id.*  Defendant and "Dave" got into a white vehicle and drove away.

On September 14, 2010, Detective Ranfranz interviewed Roger Bishop who stated that he knows a man named "Rob" who lives at David Casler's residence on 75th Street.  *Id.*  Mr. Bishop stated that "Rob" had come over to his residence several times, and on a recent occasion "Rob" had come over with a handgun.  *Id.*  Mr. Bishop described the handgun as a revolver with an octagonal shaped barrel.  *Id.*  Mr. Bishop stated that he knew "Rob" had a .308 caliber rifle, a .45 caliber handgun and a .22 caliber handgun.  *Id.*

The affidavit also describes the warrant search of Defendant's Honda, conducted on September 14, 2010 and described above.  The affidavit describes the items found in the vehicle, including: a "Tikka Model M695, 30-60 caliber Rifle with a scope, serial number #203381 . . . in a soft long gun case and had a loaded clip next to it" and a "Black Soft Sided Briefcase [containing] H & R Sportman .22 caliber (Long Rifle) Revolver, serial number #R9586 in a black nylon holster . . . fully loaded with .22 rounds in each chamber."  *Id.*  The affidavit states that Detective Ranfranz ran a criminal history check on Defendant, who was found to be a convicted felon.  *Id.*

Based upon the foregoing, State District Court Judge Debra A. Jacobson signed the warrant for Defendant's DNA on September 15, 2010 (Govt. Ex. 1.)  Detective Ranfranz took a swab of Defendant's DNA on that same day.  *Id.*

## G.     Defendant's September 21, 2010 Statement

On September 15, 2010, Agent Rohrbaugh and Detective Ranfranz went to the Adult Detention Center to interview Defendant. (Tr. 113.)  Agent Rohrbaugh read Defendant a Miranda warning, and Defendant stated that he didn't wish to speak to them without his attorney present. (Tr. 114.)  The interview was terminated.  *Id.*

Between September 15 and September 21, Defendant left a message with Agent Rohrbaugh asking to speak to him, and made several attempts to contact Detective Ranfranz.  (Tr. 114-115.)  Agent Rohrbaugh and Detective Ranfranz returned to the Adult Detention Center to speak with Defendant on September 21, 2010.  *Id.*  Agent Rohrbaugh asked Defendant if he had reinitiated contact because he wished to speak to them. (Tr. 115.)  Defendant stated that he did wish to speak with them.  *Id.*  Agent Rohrbaugh read Defendant an advice of rights form (Govt. Ex. 8B) and instructed Defendant to sign if he agreed. (Tr. 117.)  Defendant signed the form and proceeded to make a statement.  (Govt. Ex. 2 and 8B.)

## H.     Consent Search of Defendant's Residence

On October 8, 2010, Loren Theel gave Agent Rohrbaugh written consent to search the property surrounding the 75th Street residence, but not the house itself. (Tr. 119-120; Govt. Ex. 10.)  A fire had rendered the house uninhabitable and unsafe. (Tr. 121.)  Mr. Theele acts as the property manager for the residence, which is owned by his mother. (Tr. 120.)  David Casler, a resident of the house before the fire, was also present and also gave consent for the search. (Tr. 121.)

## II.   CONCLUSIONS OF LAW

**A.   Defendant's Motion to Suppress Electronic Surveillance Evidence Should Be Denied as Moot**

The Government represented at the hearing that it does not intend to offer at trial any evidence derived from electronic surveillance.   It appears that Defendant's Motion to Suppress Electronic Surveillance (ECF No. 17) is moot and should be denied.

**B.   Defendant's Motion to Suppress Identifications Should Be Denied as Moot**

The Government has indicated that no identification procedures were used with respect to Defendant.   Defense counsel conceded at the hearing that no issue remains with regard to identifications.   Thus, Defendant's Motion to Suppress Identifications (ECF No. 18) should be denied as moot.

**C.   Defendant's Motion to Suppress Search and Seizure Evidence Should be Denied**

**1.   July 31, 2010 Search and Seizure of Defendant's Vehicle**

The Government represented in its memorandum that it will not introduce evidence at trial derived from the search and seizure of Defendant's vehicle on July 31, 2010.   (Govt.'s Consolidated Resp. To Def.'s Mots. to Suppress ("Govt.'s Resp.") at 1, ECF No. 38.)   To the extent Defendant seeks to suppress such evidence, the motion is moot and should be denied.

**2.   Traffic Stop on September 13, 2010**

Defendant argues that the stop of his vehicle on September 13, 2010 was without probable cause and was therefore a violation of his rights under the Fourth Amendment of the United States Constitution.   The Government argues that Deputy Lavigne had probable cause to believe Defendant had violated the traffic laws by making an unsafe change of course.

"As a general matter, the decision to stop an automobile is reasonable where the police have

probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 813 (1996). The Minnesota statute regarding change of course provides in relevant part that "No person shall . . . move right or left upon a highway unless and until the movement can be made with reasonable safety after giving an appropriate signal . . . ." Minn. Stat. § 169.19, subd. 4.

Deputy Lavigne testified that he observed Defendant commit an unsafe change of course. Deputy Lavigne was following behind Defendant in the left late of a three lane highway when he observed Defendant "turn[] on his right signal and abruptly move[] across the lanes of traffic, and then just barely make[] the off ramp." (Tr. 45.) Deputy Lavigne stated that Defendant started this maneuver when he was "almost directly across from the off ramp." *Id.* Deputy Lavigne described Defendant's driving behavior as "evasive" and "counter-surveillance . . . to see if anybody is following." *Id* Deputy Lavigne did not recall seeing any other cars on the highway at the time.

Defendant argues that the driving described by Deputy Lavigne does not constitute an unsafe change of course under Minnesota law. Defendant argues that because he activated his turn signal before changing lanes, and because there were no other vehicles on the highway, the change of course was made with "reasonable safety" as required by statute. However, in determining whether a traffic stop was supported by probable cause, "the determinative question is not whether [the driver] actually violated the Motor Vehicle Code . . . but whether an objectively reasonable police officer could have formed a reasonable suspicion that [the driver] was committing a code violation." *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005). The Court finds Deputy Lavigne's determination that Defendant's abrupt exit from the highway constituted an unsafe change of course under Minn.Stat. § 169.19, subd. 4 to be objectively reasonable. Because Deputy Lavigne had probable cause to believe a traffic violation had occurred, the resulting traffic stop was valid.

### 3.      Prolonged Detention and Search of Defendant at the Scene of the Traffic Stop

Defendant argues that his detention after the traffic stop was prolonged with no constitutional justification.  After the passenger fled the vehicle and was pursued by Deputy Wallace, Deputy Lavigne removed Defendant from the vehicle, patted him down, removed all belongings from his pockets, put him in handcuffs, and placed him in the back of the marked squad car.  (Tr. 52-53, 59.)  Defendant argues there was no constitutional basis to search Defendant or take him into custody at this time, because he was being held merely as a witness to the shooting, and not for any violation of the law.  (Def. Mem. at 5.)

An officer may detain a vehicle after the initial stop is completed provided the officer has a reasonably articulable suspicion that criminal activity is afoot.  *United States v. Beck*, 140 F.3d 1129, 1134 (8th Cir. 1998).  "Whether particularized facts known to the officer amount to an objective and reasonable suspicion of criminal activity is determined in light of the totality of the circumstances."  *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994).  "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops."  *U.S. v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007).  Police may order a person out of a vehicle during a traffic stop, and may frisk that person for weapons if there is "a reasonable belief that they are armed and dangerous."  *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1983).

In this case, as Deputy Wallace was approaching the stopped car, the passenger fled the car on foot.  The passenger matched the description of bank robbery suspect David Paquin.  Defendant then identified himself to Deputy Lavigne as "Rob" and identified the passenger as "Dave."  Deputy Lavigne believed based on this information that the fleeing passenger was bank robbery suspect

David Paquin, and that the driver, Defendant, was the man named "Rob" with whom Mr. Paquin was living, according to Tod Chazen. Tod Chazen had also informed law enforcement that there were guns at the house where "Rob" and Mr. Paquin were staying. While Deputy Lavigne was patting down Defendant, he heard gunshots.

In light of the above facts, it was reasonable for Deputy Lavigne to detain Defendant for further inquiry regarding his role in the bank robbery and in Mr. Paquin's flight from police. Deputy Lavigne's frisk of Defendant was also justified because based on the information regarding guns in the investigation, Deputy Lavigne had a reasonable suspicion that Defendant was armed and dangerous.

### 4.     The Detention of Defendant at the Adult Detention Center

Defendant argues that his detention at the Olmsted County Adult Detention Center on the night of September 13, 2010 into the morning of September 14, 2010 was a violation of his Fourth Amendment rights. The Government alleges that Defendant was arrested at the scene for driving after suspension ("DAS") and was transported to the Olmsted County Adult Detention Center to be detained on that charge, as well as to be held for questioning regarding the shooting. Defendant argues that the facts reveal he was not arrested for DAS until Officer Behrns brought the citation to the booking deputy around 4:00 a.m. Defendant argues that because he was not under arrest from the time he was transported to the Adult Detention Center around 9:45 p.m. until approximately 4:00 the next morning, that detention was unconstitutional.[4] Defendant seeks to suppress the evidence

---

[4]Defendant does not dispute the constitutionality of his detention once the citation for DAS was issued. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (upholding arrest for misdemeanor seatbelt violation).

obtained through all subsequent searches and all subsequent statements as fruit of this unlawful detention.

The evidence Defendant seeks to suppress as fruit of the alleged unlawful detention includes: evidence obtained from warrant searches of his car and residence; evidence obtained from a consent search of his residence; and a statement he made to law enforcement on September 21, 2010. The Government argues that the search warrants, the consent to search, and the voluntary nature of Defendant's statement serve as independent, lawful causes of the discovery of the evidence at issue that purge the taint of the alleged illegal detention. (Govt. Resp. at 26-30.)

Under the "attenuation" doctrine, challenged evidence is admissible if "the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *United States v. Crews*, 445 U.S. 463, 470 (1980). In determining whether sufficient attenuation exists, courts must consider the following factors: (1) the temporal proximity between the illegal search or seizure and the intervening act; (1) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *United States v. Becker*, 333 F.3d 858, 862 (8th Cir. 2003).

This Court need not make a determination of whether or not Defendant was illegally detained between 9:40 p.m. and 4:00 a.m. on September 13 and 14, 2010, because an application of the above mentioned factors to each of the later searches and statements establishes that even if Defendant were illegally detained, the challenged evidence is so attenuated that the taint of the illegal action is purged. All challenged searches and the challenged statement occurred after Defendant was arrested on felony drug charges on September 14, 2010. (Tr. 107.) This arrest and subsequent lawful detention serves as an intervening circumstance that purges the taint of illegal detention from

the subsequent searches and statement.  Below the Court applies the attenuation factors to each of the challenged searches and the challenged statement.

### a. Defendant's September 21, 2010 Statement

Defendant does not argue that his statement on September 21, 2010 was involuntary or that he did not reinitiate communication with law enforcement after invoking his right to counsel. Defendant only argues that the statement was the fruit of the alleged unlawful detention.

Defendant originally invoked his right to counsel after being read his Miranda rights at the beginning of an interview on September 15, 2010, two days after the alleged illegal detention.  Over the course of the next week Defendant made several calls to law enforcement asking that they return to speak with him.  When Agent Rohrbaugh and Detective Ranfranz returned to speak to Defendant on September 21, 2010, they again read Defendant his Miranda rights and Defendant waived his previously invoked right to counsel.  *See Edwards v. Arizona*,  451 U.S. 477, 484-486 (1981) (statements made by an accused who initially invoked his right to counsel are admissible if the accused himself initiates further communication, exchanges, or conversations with the police and makes a valid waiver of his previously invoked right to counsel).

The Court finds the September 21, 2010 statement to be sufficiently attenuated. The statement was given eight days after the alleged illegal detention.  Additionally, Defendant's invocation of his right to counsel, and subsequent re-initiation of communication and waiver of his right to counsel constitute intervening circumstances that purge the taint of the illegal detention. Defendant's statement to law enforcement on September 21, 2010 should not be suppressed as the fruit of the alleged unlawful detention.

### b. Search Warrants for Defendant's Car, Residence, and DNA

Defendant also argues that all evidence derived from searches of his house and car, and the DNA sample taken from him, should be suppressed as fruit of the illegal detention. These searches and seizures were all completed pursuant to warrants. As discussed below, the Court finds that all three warrants were supported by probable cause. Additionally, the search warrant affidavits did not include evidence obtained as a result of Defendant's alleged illegal detention. The Court finds that the search warrants constitute intervening circumstances and that evidence obtained as a result of these three searches is not the fruit of Defendant's alleged illegal detention.

### c.      October 8, 2010 Consent Search of Defendant's Residence

Defendant argues that the search of the property surrounding his residence on October 8, 2010 was the fruit of his illegal detention. Defendant does not argue that property manager Loren Theel and resident David Casler did not have the capacity to consent to search the property or that their consent was not voluntarily given. The Court finds that based on the consent to search given by Mr. Theel and Mr. Casler (Govt. Ex. 10), and the fact that this search occurred 24 days after Defendant's alleged illegal detention, the search was causally unconnected to the alleged unlawful detention. Evidence obtained from the search of Defendant's property on October 8, 2010 is admissible, and to the extent Defendant seeks to suppress it his motion should be denied.

In light of the above discussion, the Court finds that no evidence Defendant seeks to suppress was obtained as the fruit of Defendant's alleged unlawful detention.

### 5.      Evidence Obtained Pursuant to Search Warrants Should Not be Suppressed

### a.      Probable Cause Standard for Issuance of Search Warrants

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized." U.S. Const. amend. IV. Under well-established Fourth Amendment jurisprudence, a valid search warrant must be supported by an affidavit providing the signing judge with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236-39 (1983). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *See id.* at 238. A supporting affidavit that consists of bare conclusions or conclusory allegations cannot support a finding of probable cause. *Id.* Veracity, reliability, and basis of knowledge are "highly relevant" in determining whether a supporting affidavit establishes probable cause. *Alabama v. White*, 496 U.S. 325, 328 (1990).

Still, because "reasonable minds" may differ as to whether a particular affidavit establishes probable cause, the Supreme Court has established a "good faith" exception to the warrant requirement, according great deference to a magistrate (or signing judge's) probable cause determination. *See United States v. Leon*, 468 U.S. 897, 914 (1984) (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). The *Leon* Court established that reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate should be admissible in the prosecution's case in chief. *Leon*, 468 U.S. at 913. On the contrary, if a warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," the *Leon* good faith exception to the warrant requirement does not apply. *Id.* at 922-23.

Additionally, whether probable cause exists depends on the totality of the circumstances. *See Gates*, 462 U.S. at 238; *United States v. Gabrio*, 295 F.3d 880, 882-83 (8th Cir. 2002). In evaluating the existence of probable cause, courts do not consider each piece of information

independently, but instead consider the cumulative meaning of all facts taken together.  *See United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

### b.      Warrant Search of Defendant's residence

The Court finds that the facts contained in the application for a search warrant provide probable cause that evidence of a bank robbery would be found in Defendant's residence on 75th Street in Rochester, Minnesota.  The affidavit describes a bank robbery on September 1, 2010 in Elgin, Minnesota.  (Govt. Ex. 3.)  The affidavit also describes how David Paquin was identified as a suspect based on the vehicle tab registration form used as the robbery note and the tattoos on his arms and chest that matched those described by the bank teller.  *Id.*  A confidential informant told law enforcement that David Paquin was staying with a man named "Rob" at the residence on 75th Street.  *Id.*  On September 13, 2010, surveillance of the house observed a white Honda with two passengers leaving.  *Id.*  After a traffic stop the occupants of the vehicle were identified as David Paquin and Defendant, Robert Hastings.  *Id.*  The Court finds that these facts, taken together, are sufficient to establish probable cause that evidence of the bank robbery would be found at the address on 75th Street.

### c.      Warrant Search of Defendant's Vehicle

Defendant makes two arguments with regard to the search of his vehicle: (1) that the search warrant was not supported by probable cause and (2) that the firearms seized must be suppressed because they were not specifically listed in the search warrant as items to be seized.

The same affidavit was filed in support of the warrants for the house on 75th Street and Defendant's vehicle.  The Court finds that the facts contained in the application for a search warrant, as described above,  provide probable cause that evidence of the bank robbery would be found in

Defendant's vehicle.

Defendant also argues that because firearms were not among the items listed in the search warrant application, their seizure went beyond the scope of the search warrant. (Def. Mem. at 9-10.) The Government argues that the firearms are admissible under the plain view doctrine. (Govt. Resp. at 31-34.) Under the plain view doctrine, a law enforcement officer is permitted to seize evidence without a warrant when: "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Armstrong,* 554 F.3d 1159, 1162-63 (8th Cir. 2009), *cert. denied,* 129 S. Ct. 2805 (2009); *see Horton v. California,* 496 U.S. 128, 136-38 (1990).

Here, law enforcement gained entry to the trunk of Defendant's vehicle and had a lawful right of access to the firearms based on the properly issued search warrant. (Govt. Ex. 2.) A lawful search extends to all areas and containers in which the object of the search may be found. *United States v. Ross*, 456 U.S. 798, 820-21 (1982). Law enforcement had access to the containers in which the firearms were found, because objects of the search such as money, a portion of the robbery note, and clothes, could have been found inside those containers. (Govt. Ex. 2.) Additionally, the incriminating nature of the firearms was immediately apparent. The note used in the bank robbery stated, "I have a gun," therefore the firearms were incriminating as there was probably cause to associate them with the bank robbery. *Payton v. New York*, 4445 U.S. 573, 587 (1980) ("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable assuming that there is probable cause to associate the property with criminal activity.")

### d.    DNA Warrant

Defendant argues that the warrant for a sample of his DNA is not supported by probable cause.  Given the totality of the circumstances in this case, probable cause existed to support the issuance of the search warrant for a DNA sample from Defendant.  The affidavit states that the DNA will be used to compare with the possible DNA found on the firearms found in the vehicle Defendant was driving.  (Govt. Ex. 1.)  The affidavit also states that Defendant is a convicted felon and as such is ineligible to possess firearms.  *Id.*  The affidavit describes the traffic stop on September 13, 2010 and the subsequent detention of Defendant and retention of his vehicle following the officer involved shooting of the passenger.  *Id.*  The affidavit also recounts a conversation with David Casler, who lived at the same residence as Defendant.  Casler told law enforcement that on the night of September 13, 2010, he observed Defendant and "Dave" leave the residence in a small white vehicle.  *Id.*  Mr. Casler stated that Hastings was carrying a black briefcase and a black bag when he left the house.  *Id.*  After the traffic stop on September 13, 2010, law enforcement searched Defendant's white Honda pursuant to a search warrant.  Two firearms were found in the trunk of the vehicle, one in a soft long gun case and the other in a black soft sided briefcase.  *Id.*

These facts, taken together, establish more than a "fair probability" that Defendant's DNA would match that found on the firearms found in the trunk of his car.  There is therefore a "fair probability" that Defendant's DNA would constitute evidence that Defendant committed the crime of being a felon in possession of a firearm.

### e.   Search of Defendant's Computer and Telephone

The Government represented at the hearing that it does not intend to offer at trial any evidence derived from the search of Defendants computer or telephone.  To the extent Defendant's

motion seeks to suppress such evidence, the motion is moot and should be denied.

**D.    Defendant's Motion to Suppress Statements Should Be Denied.**

The government represented that is will not introduce at trial any statements by Defendant other than the statement taken on September 21, 2010.  (Govt.'s Resp. at 2.)  To the extent Defendant seeks to suppress any other statements by Defendant, the motion should be denied as moot.  As addressed above, Defendant's statement from September 21, 2010  was not the fruit of the alleged unlawful detention on September 13, 2010.  Defendant does not challenge the admissibility of his September 21, 2010 statement on any other grounds.  Defendant's motion to suppress statements should be denied.

### III.    RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's motions be **DENIED** as follows:

1)    Defendant's Motion to Suppress Evidence from Unlawful Searches and Seizures (ECF No. 14) should be **DENIED**.

2)    Defendant's Motion to Suppress Statements Made by Defendant (ECF No. 16) should be **DENIED**.

3)    Defendant's Motion to Suppress Electronic Surveillance Evidence (ECF No. 17) should be **DENIED as moot**.

4)    Defendant's Motion to Suppress Identifications (ECF No. 18) should be **DENIED as moot**.

DATED: May 23, 2011                         *s/ Franklin L. Noel*

FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **June 6, 2011**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **June 6, 2011** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.

23